**In re 29 NEWBURY STREET, INC., Debtor.**

**Bankruptcy No. 87–10363–JNG.**

United States Bankruptcy Court, D. Massachusetts.

July 10, 1987.

Alvin S. Nathanson, Nathanson & Goldberg, Boston, Mass., for movant.

Robert Resnick, Cullen & Resnick, Boston, Mass., for debtor.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the motion, filed on May 5, 1987, by Saunders and Associates ("Saunders"), agents for 29–33 Newbury Street Trust, for relief from the automatic stay imposed by section 362 of the Bankruptcy Code. Saunders seeks, in addition to relief from the automatic stay, an order granting it possession of premises it leases to 29 Newbury Street, Inc. (the "Debtor"). The Debtor operates a high quality restaurant located at 29 Newbury Street in Boston's prestigious Back Bay area. It filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 16, 1987.

## FACTS

The dispute between Saunders and the Debtor has a complicated history that involves another debtor before this Court, Newbury Cafe, Inc. d/b/a 29 Newbury ("Newbury Cafe"). Newbury Cafe filed a voluntary petition for reorganization under Chapter 11 on October 9, 1985. Less than two months later, on November 22, 1985,

Stephen Gray ("Gray" or the "Trustee") was appointed the Chapter 11 Trustee of Newbury Cafe.[1] Prior to the filing of the petition, John Aument, a principal of Newbury Cafe, had a written lease with Saunders dated November 6, 1981. The term of the lease, which commenced on November 1, 1981, was for 120 calendar months. In August of 1982, John Aument, with Saunders' consent, assigned the lease to Newbury Cafe. On May 1, 1985, five months prior to the filing of Newbury Cafe's bankruptcy petition, Newbury Cafe, John Aument and Saunders entered into an agreement by which the lease was amended by *inter alia* increasing the minimum rent and revising section 14.1(a) of the lease to provide for the payment of $30 per day additional rent in the event of a default by the tenant continuing for more than 20 days.[2]

In April of 1986, the Trustee of Newbury Cafe filed with the Court a notice of his intention to sell assets of Newbury Cafe's estate to Sally D. Hurlbut Enterprises, Inc. The Court conducted a hearing on the Notice of Intended Private Sale on April 25, 1986. At that time, the Court received a number of counter-offers for Newbury Cafe's assets. Following the submission of sealed bids, the Court approved the sale of assets to George Lewis, Jr. ("Lewis"), a principal of the Debtor, for $305,000. The successful assumption and assignment of the Saunders' lease and the transfer of Newbury Cafe's liquor license were conditions of the sale.[3]

On April 28, 1986, the Trustee filed an Application for Authority to Assume and Assign [Newbury Cafe's] Unexpired Lease with Saunders. Saunders vigorously opposed the motion. Nevertheless, on May 14, 1986, the Court allowed the Trustee's

---

**1.** The docket in case number 85–01113–JNG shows that Stephen Gray's appointment was approved by the Court on December 2, 1985.

**2.** Specifically, paragraph 4 of the amendment revises section 14.1(a) of the lease as follows:

Tenant defaults in the payment of rent or any other payment hereunder and such default continues for a period of twenty (20) days, in which case, in addition to any and all other remedies provided in this Lease, as amended,

commencing on the 21st day after such default Tenant shall pay to Landlord, without notice, additional rent in the amount of Thirty Dollars ($30.00) a day for each and every day until such time as Tenant has paid in full all such arrearages in good funds or Landlord regains possession of the premises.

**3.** The sale was also conditioned upon the successful assumption and assignment of certain equipment leases.

application and entered a bench order authorizing the assumption and assignment of the lease to Lewis or his nominee.

Following the Court's May 14, 1986 order, the Trustee, in mid-May, granted Lewis permission to enter the premises for the limited purposes of cleaning the premises. On June 1, 1986 the parties executed closing documents and an escrow agreement pursuant to which the Trustee held the purchase price in escrow pending 1) entry of orders by the Bankruptcy Court confirming the sale free and clear of liens and encumbrances; and 2) approval of the transfer of the liquor license by the Massachusetts Alcoholic Beverages Control Commission.[4] The actual closing in escrow took place on June 2, 1986.

On June 6, 1986, the Court entered two orders, one confirming the sale of assets free and clear of liens, encumbrances and security interests and the other confirming and approving the assignment of the lease with Saunders free and clear of liens, encumbrances and security interests. The latter order provided that:

> *any and all defaults* under the lease be cured and are so cured by a payment of $39,878.73 by the Trustee. Such payment shall satisfy all rental payments under the Lease through June 2, 1986 (except for the rent due for the month of June 1986).... (emphasis supplied)

The order authorized and confirmed the assignment of the lease *nunc pro tunc* to May 14, 1986.

Both Gray and Lewis testified that the closing was to take place after the expiration of the appeal period from the entry of the Court's order approving the assumption and assignment of the lease. It appears that the parties were operating under a misconception with respect to the date the order was entered or they erroneously counted the 10 day appeal period from June 2, 1986. The Court can only surmise that a form of order was submitted to the Court on or about June 2, 1986 and that the parties assumed it would be acted upon

immediately. The Court can conceive of no other explanation as to why the closing took place on June 13, 1986, rather than on June 17, 1986, other than the fact that Lewis may not have obtained physical possession of the liquor license until around June 13th.

On June 13, 1986, Trustee's counsel paid Saunders $10,000 to replenish the security deposit and $39,878.73 to cure all defaults. On the same day, the Debtor gave Saunders an irrevocable standby letter of credit in the amount of $36,100 and paid rent for the entire month of June 1986 in the amount of $6,100. By check dated June 22, 1986, the Trustee paid to the Debtor Newbury Cafe's pro rated share of the June rent, i.e., rent for 13 days.

With the conclusion of these transactions, the relationship between the Debtor and Saunders commenced. At the time, the parties were not concerned with the specific date upon which the assignment of the lease to the Debtor took effect. However, on July 22, 1986, in a letter to Debtor's counsel regarding water meter readings, Saunders' counsel, James Gross, evidenced his belief—a belief in line with the testimony of Gray and Lewis—that the Debtor "took possession of the leased premises on June 13, 1986."

On or about October 21, 1986, Saunders sent the Debtor an invoice (number 7161) for $2,635.20 in additional rent for the increase in the Consumer Price Index ("CPI") for the period November 1, 1985 to October 31, 1986 coupled with a notice that November 1, 1986 would be the effective date for a new monthly rent of $6,320. Saunders, in the CPI invoice, incorrectly billed the Debtor for a period of time in which the Debtor did not occupy the premises. Specifically, with respect to the proper period, the Debtor maintains it is only liable for CPI charges accruing after June 13, whereas Saunders only now asserts that the Debtor is liable for such charges after June 2, 1986, the day of the escrow closing and the termination of the cure period. Accord-

---

**4.** The liquor license was transferred on May 15, 1986 with final approval granted on June 3, 1986. Lewis testified that he did not receive the liquor license itself until the 10th or 11th of June.

ing to Saunders the amount of CPI additional rent for the 11 day period in dispute is $77.59, although the Court's review of the figures in Saunders' post-trial memorandum indicates the correct amount in dispute is $80.59.

On November 19, 1986, Saunders, through its Property Manager Patricia A. Brady ("Brady"), advised the Debtor that it had not received payment for invoice number 7161 and that the Debtor had paid $6100 for November in minimum rent instead of $6320. Subsequently, on December 11, 1986, Brady wrote to the Debtor, stating:

> Please be advised that if we do not receive full payment in the amount of $2,635.20 or written legal documentation which specifically states that you are not obligated to or responsible for paying this invoice in full by 5:00 PM on Monday, December 15, 1986, then we will have no recours[sic] but to commence a legal action to evict you from the premises for non-payment of rent.

Contemporaneously with Brady's December 11, 1986 letter, the Debtor was served with a 14 day notice to quit for nonpayment of rent. The notice to quit was dated December 11, 1986. It set forth a rent arrearage of $2,635.20.

In accordance with the terms of Brady's December 11, 1986 letter, Lewis, on behalf of the Debtor, tendered to Saunders on December 15, 1986 the sum of $1,002.84 as pro rata payment for 1986 CPI additional rent for the period June 13, 1986 through October 31, 1986. The Debtor heard nothing from Saunders with respect to the CPI issue until January 29, 1987 when Saunders served it with a summary process complaint alleging nonpayment of rent in the amount of $2,635.20. The answer date for the summary process complaint was February 17, 1987.[5] However, the Debtor filed its answer on February 11, 1987.

According to Saunders, the Debtor owed it the following rent on February 17, 1987:

a. Balance of Rent due under the C.P.I. Clause of said Lease for the period 6/3/86 – 10/31/86 (151 days)

Amount owed .............$1,083.43
Amount paid on 12/15/86 ..$1,002.84
Balance Due ......$ 77.59 [sic]

b. Additional Rent due on C.P.I. under § 4 of the Amendment to lease date May 1, 1985

11/11/86 – 2/17/86 [sic]
99 days @30/day .........$2,970.00

c. Water/Sewer due as additional rent

Billed on 1/22/87
Due on 2/11/87 ...........$ 933.20

d. Additional Rent due on Water/Sewer under § 4 of the Amendment to Lease dated May 1, 1985

2/12/87 – 2/17/86 [sic]
5 days @$30 day .........$ 180.00

e. Rent due under the C.P.I. clause said Lease for the period 11/1/86 – 1/31/87

Billed on 1/22/87
Due on 2/11/87 ..........$ 246.48

f. Additional Rent due on C.P.I. rent under § 4 of the Amendment to Lease dated May 1, 1985

2/12/87 – 2/17/87
5 days @30/day ..........$ 180.00

TOTAL RENT DUE AS OF FEBRUARY 17, 1987 ..........$4,527.27 [sic]

On February 23, 1987, Saunders filed a Motion to Amend Account Annexed in the summary process action in which it demanded an additional $1,020 in additional rent at $30 per day for 34 days for the original CPI charge. Saunders began counting the 20 day period from October 21, 1986. On the same day, February 23rd, the Debtor received a second notice to quit for failure to pay water and sewer charges in the amount of $933.20, CPI charges in the amount of $246.48 and taxes in the amount of $1,352.63. This notice to quit was dated February 13, 1987 and was sent via certified mail. One of two postmarks on the envelope bears a date of February 20, 1987.

5. The answer date on the summary process complaint is February 16, 1987, Presidents' Day, a federal holiday. Accordingly, the answer was due one day later on February 17, 1987.

On February 25, 1987, one day prior to trial in the Boston Municipal Court and prior to the filing of the Chapter 11 petition, the Debtor filed a complaint for injunctive relief in the bankruptcy court in the Newbury Cafe case and obtained a temporary restraining order.

With respect to the water and sewer bill dated January 22, 1987, the Debtor paid the amount due on February 27, 1987. With respect to the CPI additional rent billed on January 22, 1987, the Debtor paid the additional rent on February 19, 1987. On March 6, 1987, the Debtor tendered to Saunders a check in the amount of $694.67. Of that amount, $450 was for additional rent at $30 per day for 15 days for the water and sewer charge, $240 was for additional rent at $30 per day for 8 days for the CPI charge and $4.67 was for interest at 12% on the water and sewer charge. The Debtor maintains and the Court agrees that the applicable charges were paid within 14 days of receipt of the second notice to quit. None of the Debtor's payments either before or after the answer date, except as indicated, included interests or costs of suit.

## DISCUSSION

Saunders strenuously maintains that it has properly terminated its lease with the Debtor prior to the filing of the bankruptcy proceeding, and, that as a consequence the Debtor has no property interest in the leasehold. Accordingly, Saunders asserts it is entitled to relief from the automatic stay imposed by section 362 of the Bankruptcy Code, presumably "for cause." 11 U.S.C. § 362(d)(1).

According to Saunders, under applicable state law, a 14 day notice to quit terminates a lease unless the tenant cures any defaults by paying all rent then due together with interest and costs of suit on or before the date upon which the answer in the summary process action is due. *See* Mass.Gen.Laws Ann. ch. 186, § 11 (West 1977 & Supp.1987); *Matter of Norwood Aviation, Inc.*, 47 B.R. 155 (Bankr.D.Mass. 1985) *aff'd*, 63 B.R. 68 (D.Mass.1986); *In re Players Pub, Inc.*, 45 B.R. 387 (Bankr.D.

Mass.1984). Thus, Saunders insists that the only issue before the Court is whether the lease was properly terminated under Mass.Gen.Laws Ann. ch. 186, § 11. Additionally, Saunders rejects any notion that the Debtor may be entitled to equitable relief or that the $30 per day default provision constitutes a penalty. Indeed, Saunders goes so far as to suggest that the Debtor's conduct has been unconscionable since the Debtor has had two grace periods to cure defaults and has put Saunders to tremendous expense and time in attempting to compel the Debtor to comply with its contract.

The Court is struck by Saunders' disingenuous argument. Contrary to Saunders' assertion that it has gone to tremendous expense and time to compel the Debtor to comply with its lease, the Court, after a lengthy evidentiary hearing at which four witnesses testified, is convinced that Saunders went to tremendous expense and time to obsfucate the issue of the amount of additional rent due in an attempt to extricate itself from an unfavorable lease with the Debtor—a lease to which it is bound only by the operation of the Bankruptcy Code, *see* 11 U.S.C. § 365(b), and this Court's order permitting the Trustee to assume and assign the lease from Newbury Cafe to the Debtor. Saunders' argument that the Debtor's conduct is unconscionable is incredible, indeed offensive to the Court, in view of its own duplicitous conduct in precipitating the instant dispute by *inter alia* 1) billing the Debtor for CPI additional rent for a period when Saunders knew or should have known that the Debtor was not in possession; 2) serving the Debtor with a notice to quit on the same day that it advised the Debtor to present evidence of the correct amount of CPI additional rent owed; and 3) failing to notify the Debtor that it did not accept the Debtor's tender of $1,002.84 on December 15, 1986. In reaching its decision, the Court cannot overlook these actions taken by Saunders. Indeed, the Court is impressed by the fact that not even Saunders' own witness could identify the correct amount of rent due on the answer date of the summary process proceeding without prompting by counsel. In

these circumstances, the Court must at a minimum emphathize with the Debtor whose Chapter 11 filing was solely as a result of its unfortunate imbroglio with Saunders.

■ In *Matter of Norwood Aviation, Inc.*, 47 B.R. 155 (Bankr.D.Mass.1985), this Court summarized the law on the subject of lease terminations in Massachusetts as follows:

> The Court is required to look to state law to determine a debtor's interest in a lease. *Johnson v. First National Bank*, 719 F.2d 270 (8th Cir.1983). Where a landlord has properly terminated a debtor's lease prior to bankruptcy the landlord is entitled to relief from stay as the debtor has no property interest in the leasehold. *In re Bricker*, 43. B.R. 344 (Bankr.D.Ariz.1984); *In re Foxfire Inn*, 30 B.R. 30 (Bankr.S.D.Fla.1983). *See* 11 U.S.C. § 541(b)(2) (1984). Under Massachusetts law a lease may be terminated for non-payment of rent by following the summary process procedures set forth in M.G.L. c. 186 § 11. A written fourteen day notice to quit terminates a lease unless the debtor tenders rent then due before the answer date in the summary process action. M.G.L. c. 186 § 11. The lessee cannot revive a tenancy after the expiration of the deadline unless the parties extend the time period by agreement. *See Margosian v. Markarian*, 288 Mass. 197, 192 N.E. 612 (1934). If a debtor files his bankruptcy petition prior to expiration of the statutory cure period, 11 U.S.C. § 108(b) gives the debtor an additional 60 days to cure existing defaults and avoid termination of the lease. *See In re Player's Pub, Inc.*, 45 B.R. 387 (Bankr.D.Mass.1984).

47 B.R. at 157–58. In the Court's view, the issue posited by Saunders is essentially correct: Did Saunders *properly* terminate the Lease? The Debtor says unequivocally no, and the Court agrees. The Court declines to give the summary process proceeding and the rights and consequences that follow from it any force and effect because the notice to quit dated December 11, 1986 was sent in bad faith. That notice recited an amount due in CPI additional rent of $2,635.20—an amount Saunders knew or should have known was more than twice the actual amount due.

In *McGrath v. Mishara*, 386 Mass. 74, 434 N.E.2d 1215 (1982), the Supreme Judicial Court considered an action by tenants against their landlord in which the tenants alleged that three notices to quit constituted unfair, deceptive or unreasonable attempt to collect debts under Mass.Gen. Laws Ann. ch. 93, § 49 (West 1984 & Supp. 1987). Although the court ruled that the tenants could not recover for the ch. 93, § 49 violation under ch. 93A, having failed to show a loss of money or property, the court did find that the landlord violated the provisions of Mass.Gen.Laws Ann. ch. 186, § 15B (West 1977 & Supp.1987) by improperly deducting from the tenants' security deposit amounts for back rent allegedly owed. The landlord argued that it should not be held liable under § 15B merely because a court later found the deduction improper. The court disagreed stating:

> The problem with the landlord's argument is that it overlooks the judge's express finding that the landlord knew or should have known that rent was not in fact due. At a minimum, a landlord must have a reasonable, good faith belief that it is entitled to an amount deducted as 'unpaid rent' under § 15B.

386 Mass. at 80, 434 N.E.2d 1215.

Although the Supreme Judicial Court's conclusion was predicated on a violation of ch. 186, § 15B, this Court is convinced that the good faith requirement articulated by the court in *McGrath* should be applied to a demand for additional rent in a notice to quit given pursuant to ch. 186, § 11 and that a Massachusetts state court judge would so rule. In the *McGrath* case, the landlord was granted a rent increase by the Boston rent control administration. According to the rent control board, the new maximum rent was not to be effective until the expiration of the lease existing on the day of its decision. Contrary to this proviso, the landlord demanded the increased rent from the tenants three months prior to the expiration of their lease. The tenants

refused to pay the increased amount and informed the landlord of the reason for their refusal. The landlord then sent the tenants three fourteen day notices to quit pursuant to ch. 186, § 11, citing the tenants' failure to pay the rental increases in the notices. Although the landlord took no action to evict the tenants, the Supreme Judicial Court agreed with the Housing Court judge that the three notices to quit "constituted an unfair, deceptive, or unreasonable attempt to collect a debt." 386 Mass. at 78, 434 N.E.2d 1215.

While this Court obviously need not reach the question of whether Saunders' notice to quit constituted an unfair debt collection practice for purposes of ch. 93, § 49, the Court finds that the December 11, 1986 notice to quit was drafted and served in bad faith. Saunders clearly knew or should have known when it demanded CPI additional rent for the period from November 1, 1985 to October 31, 1986 that the Debtor was not liable for seven of the 12 months for which it was billed because the Debtor did not take possession of the leased premises until June of 1986. Accordingly, the Court does not recognize the validity of the summary process action, finding support for its view in *Oakes v. Munroe*, 62 Mass. 282 (1851).

In the *Oakes* case, the court considered a complaint brought to recover possession of premises occupied by a tenant under a written lease on the grounds that the lease had been determined by a notice to quit. The court held that a proceeding to recover possession could not be maintained if that proceeding was predicated upon a notice to quit "forthwith." The court ruled that such a demand did not conform to the statute. The court rejected the landlord's argument that the notice was valid because the summary process complaint was not commenced until after the expiration of fourteen days from the service of the notice. The court stated that if the notice "contains any specification of the time when the tenant is required to quit the premises, it should specify it truly, otherwise it would serve to mislead him, and thus defeat the very purpose for which it was intended." 62 Mass. at 286. The

court further explained its rationale as follows:

A notice to quit, under the statute, is a distinct act upon which important rights and consequences are made to depend. It must, therefore, be sufficient and perfect of itself without reference to any subsequent proceedings. It is not made to depend upon them for its validity, but they upon it. The argument by which the plaintiffs seek to sustain the validity of the notice, in this case, would make the sufficiency of a notice to quit to depend not upon is own intrinsic validity but the proceedings which are to follow it. Such a construction would defeat the main object in requiring a notice to be given to the tenant, for he would then be left to wait for the commencement of the summary proceedings, in order to ascertain the object of his lessor in giving him the notice.

*Id.* at 287.

■ In view of the *Oakes* decision, this Court finds that Saunders cannot rely upon its notice to quit, and the Debtor's alleged failure to tender all rent then due plus interest and costs of suit in the summary process proceeding, to argue that the lease was properly terminated prepetition. The notice to quit which this Court has found was sent in bad faith cannot be validated by the subsequent summary process action. Although it is absolutely clear that Saunders is entitled to be paid pursuant to the terms of its lease, this Court will not function as a "rubber stamp" for Saunders in its 'quest to terminate its lease with the Debtor, *see Kargman v. Dustin*, 5 Mass. App. 101, 106–07, 359 N.E.2d 971 (1977), particularly, where, as here, there is a serious issue as to the correct amount of rent due under the lease.

■ Saunders asserts that, since Mass. Gen.Laws Ann. ch. 186, § 11 does not mandate the inclusion of the amount of rent claimed by the landlord in a notice to quit, a tenant is not excused, as a matter of law, from paying any rent if the landlord includes an erroneous amount. It also asserts that a notice to quit is not invalidated

by the inclusion of an erroneous amount. Saunders goes on to argue that the Debtor's principal was never mislead by the demand for the wrong amount of CPI additional rent and was never excused from paying late charges with respect to that amount pursuant to paragraph 4 of the May 1, 1985 amendment to the lease.

Saunders argument is remarkably similar to that of the landlord in *Oakes*. Although the Court can understand Saunders' attempt to shift the spotlight from its actions to those of the Debtor, the Court declines Saunders' invitation to do so. The fact that the Debtor was not mislead does not excuse Saunders' bad faith demand. The tenants in the *McGrath* case were not mislead either but that did not stop the Supreme Judicial Court from finding that the landlord's notices to quit to be unfair debt collection practices.

With respect to the Debtor's obligation to pay the $30 per day additional rent for defaults, the Court observes that the lease, per paragraph 15.7, provides that:

[w]henever, by the terms of the lease, a notice is required to be given ... such notice shall be in writing and shall be hand sent by delivery or by registered or certified mail, return receipt requested, postage prepaid ... All such notices shall be effective upon receipt (if delivered by hand) or upon deposit in the United States mail within the Continental United States (if given by mail).

The Court finds that the lease is ambiguous with respect to the landlord's obligation to give the Debtor notice of CPI additional rent and other charges under the lease. Although Saunders, pursuant to the lease, is under no obligation to actually notify the Debtor of its intent to impose the $30 per day additional rent charge pursuant to paragraph 4 of the amendment (and revised section 14.1(a)), the Court observes that the calculation of the 20 day grace period is problematic if a mailing date is not unequivocably established. Despite testimony that bills were mailed promptly after their preparation, the accuracy of the Court's observation is substantiated by Saunders' second notice to quit. That notice to quit, which was sent by certified mail, is dated February 13, 1987. The envelope bears two post marks: the postage meter-produced mark bears a February 10, 1987 date, whereas the regular postmark bears the date February 20, 1987. Clearly, reliance on just the date of the notice, i.e., February 13, 1987 (or, with respect to the CPI issue, the date on the bill for CPI additional rent) would not necessarily establish the correct date for counting the 20 day grace period that the Debtor is entitled to under the lease. As a consequence, the Court cannot find that the Debtor's failure to pay the $30 per day additional rent charge in any way undermines its finding with respect to Saunders bad faith demand and the Debtor's good faith tender of $1002.84. However, the Court finds that pursuant to its order of June 6, 1986, Saunders is entitled to the disputed sum of $77.59 which it claims in CPI additional rent. Consistent with the arrangement with respect to the monthly rental, the Debtor, in turn, is entitled to reimbursement from the Trustee of Newbury Cafe. The Court notes, however, that Saunders' entitlement to this *de minimis* sum in no way affects this decision, particularly in view of the acknowledgment by Saunders' former counsel that the Debtor took possession on June 13, 1986.

Because the Court has found that the summary process proceeding was ineffective and that the 14 day notice to quit did not properly terminate the lease, it is clear that Saunders is neither entitled to relief from stay nor entitled to possession of the leased premises. Moreover, the Court's decision obviates the need to decide the remaining issues in the case, i.e., whether the $30 per day additional rent charge constitutes an impermissible penalty in bankruptcy and whether equitable principles should be applied to reverse any termination of the lease. It is sufficient to note that in view of the Supreme Judicial Court's decisions in *Howard D. Johnson Company v. Madigan*, 361 Mass. 454, 458–59, 280 N.E.2d 689 (1972) (Equitable relief is proper where breach of lease covenant did not prejudice landlord and tenant demonstrated good faith in subsequent substantial com-

pliance.), and *Edward's Fine Furniture, Inc. v. DiTullio*, 356 Mass. 380, 252 N.E.2d 348 (1969) (Injunction prohibiting landlord from prosecuting a summary process action to recover possession is proper where delay in remanding sum demanded by lessors 1) "was due to an honest difference of opinion between the parties on the method of computing the additional charge;" 2) "was not intended to deprive the lessors of any money rightly due them"; and 3) would work a forfeiture.), the Court is convinced that equitable relief might be appropriate.[6]

As a final matter, the Court observes that there is a judicial interest at stake here. The Court, after notice and a hearing, approved the assumption and assignment of Newbury Cafe's lease to the Debtor over the objection of Saunders. Although section 365 of the Bankruptcy Code implicitly recognizes that an assignee of a lease may be liable for the breach of that lease, 11 U.S.C. § 365(k), the Court is concerned that a landlord determined to avoid a lease, and unable to achieve that objective directly through an objection to the assignment of the lease, could achieve the objective indirectly by the type of conduct engaged in by Saunders after the assignment.

In view of the foregoing, the memoranda and arguments of counsel, whether or not specifically mentioned, the Court hereby denies Saunders' Motion for Relief from Stay.

---

**6.** The seminal case on equitable relief from forfeitures is *Eno Systems Inc. v. Eno*, 311 Mass. 334, 41 N.E.2d 17 (1942). In that case, the Supreme Judicial Court stated:

> The decisions of this court have followed the general principle that equity does not favor a forfeiture. Relief against forfeiture has been granted although a lessee has failed to pay rent at the times and in the manner designated by the lease and even if such failure has been wilful and intentional, or where the lessee has breached a collateral covenant to repair or to furnish fire insurance and such breach has been due to accident or mistake and no harm has resulted to the lessor, or where, if the lessor was harmed, the damage could be readily ascertained and compensation paid so that the lessor would be put in the same position as if no such breach had occurred. But where the conduct of a lessee has been such as not to commend itself to a court of equity or where the circumstances of a particular case are such that the granting of relief would impose an unjust and unreasonable hardship on the lessor, then a forfeiture has not been set aside.

*Id.* at 338, 41 N.E.2d 17 (citations omitted).